## THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF PUERTO RICO

IN THE MATTER OF:            :       **CASE NO. 12-07949-ESL**

                                :

**SANTOLAYA, INC.**            :

                                :       **CHAPTER 11**

           **DEBTOR**       :

_____ :

### CREDITOR, UNITED STATES FIDELITY AND GUARANTY COMPANY'S, <u>MOTION TO DISMISS</u>

**TO THE HONORABLE COURT:**

COMES NOW, United States Fidelity and Guaranty Company ("USF&G"), by and through its undersigned counsel, DeVlieger Hilser P.C., and moves for the entry of an Order of Dismissal of Debtor's Chapter 11 Bankruptcy Petition.  In support of thereof, USF&G states as follows.

### <u>INTRODUCTION</u>

1.      Debtor, Santolaya, Inc., ("Santolaya"), is a Co-Defendant in a civil action currently pending in the United States District Court for the District of Puerto Rico before the Honorable Jose Antonio Fuste at 11-cv-01210-JAF, ("the Santolaya Suit").

2.      Also named as Defendants in the Santolaya Suit are Debtor's two officers, Fernando Vigil Fernandez, ("FVF"), and Fernando Vigil Piovanetti, ("FVP"), and Clarisse Piovanetti, ("CP").  At all times relevant hereto, FVF and CP, (hereinafter collectively "the Vigils"), have been husband and wife.  FVP is the Vigils' only son.[1]

3.      In or about August of 1998, FVF and FVP established Santolaya.[2]

---

[1]  FVF, CP, FVF and Santolaya shall hereinafter collectively be referred to as "the Vigil Defendants."

[2]  As set forth at length below, Santolaya is merely an agent or alter ego of FVF, CP and FVP.  Because, however, it is the entity where their assets are placed, it was the first of the Vigil Defendants to file for Bankruptcy

4.      Santolaya filed its Chapter 11 Petition on the afternoon of Friday, October 5,

2012.  (Docket No. 1).

5.      FVF, CP and FVP then filed their own Petitions with this Court on Monday,

October 8, 2012 while the Court was closed in observance of Columbus Day.

6.      The Santolaya Suit was set to commence a Jury Trial on the morning of October

9, 2012 but did not proceed after Counsel for the Vigil Defendants advised the District Court of

the respective petitions filed with this Court.[3]

7.      Judge Fuste directed that the Santolaya Suit be continued until this Court  had an

opportunity to evaluate if a stay is proper.  Judge Fuste further directed that the Santolaya Suit

was to be reinstated in the calendar for an expedited trial as soon as the issue of the stay was

dealt with by this Court.  Finally, Judge Fuste assessed the jury costs for the day against the Vigil

Defendants and their Counsel jointly and severally, payable within 24 hours of calculation under

penalty of default.  (Santolaya Suit, Docket No. 114).

8.      The Santolaya Suit was originally commenced in February of 2011 against the

Vigils and sought to void transfers made between the Vigils which USF&G asserts were

fraudulently made.

9.      The Santolaya Suit arose out of the entry of Judgment in USF&G's favor in a

separate action before the District Court.

10.     To be precise, on October 9, 2002, USF&G, in its capacity as surety, filed a

---

prior to trial in the Santoalaya Suit.

[3] Indeed, the Santolaya Suit had been set for a jury trial to commence on October 9, 2012 since August 21, 2012 when the Vigil Defendants successfully obtained a continuance of an August 27th trial date.  (Santolaya Suit, Docket No. 106).

Third Party Complaint in the District Court for indemnification and reimbursement against

Ingenieros & Proyectistas, Inc., ("I&P") and its four principals, FVF, CP, Miguel A. Maldonado

Lopez and Rosario I. Guzman Nieto.  That matter was assigned Docket No. 01-2597 (PG/JAF),

("the I&P suit").

11.     On July 24, 2009, the District Court entered a Judgment, in the amount of

$778,191.55,  in favor of USF&G in the I&P suit and against I&P and its four principals,

including the Vigils.

12.     Following the entry of the Judgment against the Vigils, USF&G proceeded on a

what respectfully could be characterized as an exhaustive pursuit to have the Vigils answer

Interrogatories in Aid of Execution and appear for Depositions in Aid of Execution.

13.     USF&G's exhaustive pursuit included, but was not limited to, the following:

•Obtaining an Order from this Court on January 19, 2010, requiring the Vigil Defendants

to provide Answers, without objection, to Plaintiff's Interrogatories within ten (10) days of the

date of the Order and to appear for deposition within twenty (20) days of the date of the Order.

(I&P suit, Docket No. 326)

•Obtaining another Order from this Court on February 24, 2010, granting a Motion for

Non-Compliance against the Vigil Defendants resulting from their failures to adhere to the terms

of this Court's Order of January 19, 2010, and requiring the Vigil Defendants to appear for

deposition on March 4, 2010.  This Court's Order of February 24, 2010, further stated that

"**failure to comply will result in contempt proceedings**."  (Emphasis added). (I&P suit, Docket

No. 329).

•Filing a Motion for Sanctions on June 2, 2010 and a Fourth Informative Motion on July

3

23, 2010, (I&P suit, Docket Nos. 333 & 334), due to the Vigil Defendants' repeated failure to comply with Orders issued by this Court.  Plaintiff further sought that a monetary sanction to be imposed against the Vigil Defendants as a result of Plaintiff having to prepare and file the aforementioned Motion for Sanctions, the Motions to Compel the Vigil Defendants' Discovery Responses and Depositions (I&P suit, Docket Nos. 322 & 323), and three prior Informative Motions addressing this willful non-compliance.  (I&P suit, Docket Nos. 328, 330 & 332)

•Obtaining an third Order on October 22, 2010, from this Court which Ordered  the Vigil Defendants to provide full and complete responses to Plaintiff's written discovery requests, without objection, no later than 11/5/2010, to appear for depositions no later than 11/22/2010, and to issue payment in the amount of $3,000 in attorney's fees as sanction for failing to comply with this Court's Orders.  (I&P suit, Docket No. 335).

14.     In August of 2010, USF&G was finally able to secure the depositions of the Vigils following the entry of Judgment in the I&P suit.  During said depositions, it was discovered that in or about 1998, the Vigils participated in formation of Santolaya which was alleged to be a property management company.  A certified translation of Santolaya's Articles of Incorporation are attached hereto as Exhibit "A."

15.     The Vigils initially alleged that FVP was the sole owner of Santoyla.

16.     The Vigils further claimed that FVP formed the company when he was twenty-three (23) years old.

17.     During his deposition in August of 2010, FVF specifically denied holding any interest in Santolaya.

18.     When asked during the same deposition whether he ever had any ownership

4

interest in Santolaya, FVF was non-responsive and indicated that his son is the "total owner of the company." *See* Exhibit "B", pg. 18, ln. 6-15.

19.     Furthermore, during said deposition, FVF was asked in what capacity he works for Santolaya and responded that he has "done consulting and I have managed partially." *See* Exhibit B, pg. 17, ln. 10-15.

20.     FVF was asked to provide more specificity with regards to his role as a consultant for Santolaya.

21.     In response, FVF testified that, as a consultant to Santolaya he assisted his son "when he needs any counseling in terms of construction and coordination with architects, and in some cases I help to collect the rent." *See* Exhibit B, pg. 20, ln. 1-5.

22.     FVF thereafter stated that he and FVP had an agreement under which FVP would make payments to FVF in accordance with the work he has rendered.

23.     When asked about the formula for payment for serving as a consultant for Santolaya, FVF noted that "basically the formula is on the time engaged" and that he is paid, on a more or less flexible rate, for the amount of time that he renders service. *See* Exhibit B, pg. 20, ln. 6-19.

24.     FVF was then asked about the range of this flexible rate of compensation which he described and testified that **"annually it could be between $30,000 and $70,000, approximately."** *See* Exhibit B, pg. 20, ln. 20-22. (Emphasis Added).

25.     When asked how long he had worked in this capacity FVF testified "approximately seven, eight years." *See* Exhibit B, pgs. 20 and 21, ln. 23-23 and ln. 1.

26.     As this deposition was taken in August of 2010, FVF's approximation would

date back to around 2002 or 2003.

27.     In November of 2011, however, FVF provided verified Answers to USF&G
which asserted that he transferred his interests in Santolaya to his son "on or about December 7,
2006."  *See* Exhibit "C", ¶ 11.

28.     That same month, FVF produced a copy of Santolaya Stock Certificate No. 5
which is dated December 7, 2006 and purports to transfer 343.26 shares to FVP.  The Certificate,
which was not signed by FVP, is attached hereto as Exhibit "D."

29.     The Vigils did not produced any contracts, notes, minutes, agreements or
writings which memorialize this transfer of interest in Santolaya to FVP.

30.     Rather, when asked to identify any such documentation, FVF responded by
stating "cancelled shares certificates."  *See* Exhibit C, No. 13.

31.     FVF further noted that, at the time of this transfer, he owed Santolaya
approximately $880,000 and that, upon his transfer of interest in Santolaya, his son became liable
for this debt to the corporation.  *See* Exhibit C, No. 12.

32.     The Vigils, however, have failed to produce any contracts, notes, minutes
agreements or writings which memorialize FVP's assumption of liability as described in
paragraph No. 29.

33.     Furthermore, the discovery process in the Santolaya Suit revealed that FVP did
not receive any ownership interest in Santolaya until December 10, 2002.  *See* Exhibit "E"
attached hereto.

34.     In contrast, FVF was issued 343.26 shares of Santolaya stock on September 6,
2000.  *See* Exhibit "F" attached hereto.

6

35.     On January 20, 2012, USF&G's Counsel had the opportunity to review documents produced by Oriental Bank and Trust, as the successor to Eurobank, ("Oriental Bank"), in partial response to a subpoena served on the Bank.

36.     Among the documents produced by Oriental Bank was R.S. & Associates-PSD "Statement of Financial Condition" of the Vigils.  This Statement noted that, as of September 30, 2006, the Vigils owned 70% of Santolaya.  A copy of the said Statement is attached hereto as Exhibit "G."

37.     A second document produced by Oriental Bank on January 20, 2012, was a copy of a Personal Guaranty, made on September 24, 2004, ("the 9/24/04 Guaranty"), by the Vigils in favor of Eurobank.  A copy of the same is attached hereto as Exhibit "H."[4]

38.     Pursuant to the terms of the 9/24/04 Guaranty, the Bank agreed to grant Santolaya "a non-revolving credit facility or loan up to the principal amount of $5,500,000.00, for the partial financing of the acquisition of a parcel of land, whereon, Santolaya would develop and construct a shopping center to be known as Santolaya Shopping Center.  *See* Exhibit H.

39.     In return for the issuance of this "non-revolving credit facility or loan" to Santolaya, the Vigils guaranteed punctual payment of all obligations of under the Loan Agreement, the Note, the Loan Documents or the Converted Loan Note.  *See* Exhibit H.

40.     Neither Santolaya nor FVP have any liability under the 9/24/09  Guaranty.

41.     In April of 2006, the Vigils sold a multi-unit rental property which they owned in Dorado Reef, ("the Dorado Reef property"), at a price of $985,000.00.  *See* Exhibit C, ¶ 16.

---

[4]  According to the Personal Guaranty, a Promissory Note, a Mortgage, a Deed of First Mortgage and a Pledge Agreement (the "Loan Documents") were also executed on September 24, 2004.  The Vigils did not, however, provide a copy of the Loan Documents.

42.     The Vigils received proceeds in the amount of $540,294.12 as a result of the sale of the Dorado Reef property.  *See* Exhibit C, ¶ 17.[5]

43.     In August of 2010, FVF testified that the net proceeds of the sale of the Dorado Reef property were used to pay off I&P debt.  *See* Exhibit B, pg. 28, ln. 6-18.

44.     Indeed, in his Verified Answer to USF&G's Complaint filed on August 5, 2011, (attached hereto as Exhibit "I"), FVF reiterated his position that the proceeds of the sale of the Dorado Reef Property "were used to pay off several Ingenieros & Proyectistas, Inc.'s debts with suppliers and subcontractors that, upon information and belief, would have otherwise filed claims under the payment bond issued by USF&G."  *See* Exhibit I, ¶ ¶ 27 and 32.

45.      Slightly more than two months later, however, FVF served Verified Interrogatory Answers upon USF&G wherein he now claimed that the proceeds of the sale of the Dorado Reef property was used to pay suppliers and contractors of Santolaya.  *See* Exhibit C, ¶ 18(iii).

46.     Furthermore, in November of 2011, the Vigils produced copies of four check which FVF had personally written during a ten day period which fell April 28, 2006 and May 6, 2006, to the following:

a.     April 28, 2006--OPTIMA, Contratista General, Inc. in the amount of **$500,000.00**, ("OPTIMA"); (Emphasis Added).

b.     May 4, 2006--Ramón Delgado & Asociados in the amount of $19,320.59;

c.     April 28, 2006--Joanne Rivera in the amount of $2,350.00 and

---

[5] $393,486.22 of the $985,000.00 obtained through the sale of the Dorado Reef property was used to repay the Defendants' existing mortgage for the property.

8

d.    May 6, 2006--Manny H. Trinidad in the amount of $750.00.

Copies of said checks are attached hereto as Exhibit "J."

47.    On November 18, 2011, the Vigils produced a thirty-five (35) page document which they described as a "List of payments by Santolaya to or on behalf of Vigil Fernandez", (the "Payment List").  A copy of the Payment List is attached hereto as Exhibit "K" and bates stamped USF&G 000001 to 000035 for identification purposes.

48.    The Payment List indicates that from January 27, 2005 through November 9, 2011, Santolaya has issued in excess of **$1,599,000.00** either directly to or on behalf of the Vigils. (Emphasis Added).

49.    Indeed, the payment list appears to contemplate both payments made by Santolaya on the Vigils' behalf as well as an accounting of monies which the Vigils were issuing to or on behalf of Santolaya.

50.    For example, the last entry listed on the page bate stamped USF&G 000005 is dated April 28, 2006.  The "Source Name" assigned to this particular entry is "Caguas Commercial Site: Walgreens.

51.    Under the collum titled "Memo" it states "Ck. #01 Fvigil-Cta. Bco. Sant..."

52.    The amount of this entry is **-$500,000.00.**

53.    As noted above, on April 28, 2006, FVF wrote a check, in the amount of $500,000.00, to OPTIMA.  As can been seen on the check itself, an individual circled and wrote the number 1 on the top left side of this draft.  *See* Exhibit J.

54.    According to Defendant-Fernandez's Interrogatory Answers, the monies used to issue this payment to OPTIMA was obtained through the sale of the Dorado Reef Property.  *See*

9

Exhibit C, ¶ 18.

55.     A careful examination of the Payment List from the date of the first entry, (January 27, 2005), through the date of FVF's "transfer" of interests in Santolaya to FVP, (December 7, 2006), reveals that Santolaya issued approximately $939,0005.74 either to or on behalf of the Vigils during this same time period.

56.     Conversely, the Payment List indicates that, from January 27, 2005 to December 7, 2006, approximately $660,582.11 was paid, presumably by the Vigils, to or on behalf of Santolaya.[6]

57.     As such, the net amount distributed by Santolaya either directly to or on behalf of the Vigils from January 27, 2005 to December 7, 2006 appears to be $278,423.63.

58.     As previously noted, no documentation suggesting that FVP assumed liability for approximately $880,000.00 of "debt" owed by FVF to Santolaya in or about December of 2006 was produced in the Santolaya Suit.

59.     Indeed, Oriental Bank also provided the following documents on January 20, 2012, all of which were executed by the Vigils on **September 29, 2009**:

a.     LOAN NOTE in the amount of $450,000.00 between the Vigils and the Bank (a copy of which is attached hereto as Exhibit "L-1"), in which the Vigils agreed to pay the Bank **thirty-five (35) consecutive monthly payments for principal and interests of  $2,697.97 commencing on October 29, 2009...**

b.     CREDIT AGREEMENT, (a copy of which is attached hereto as Exhibit "L-2"),

---

[6] $522,420.59 of the estimated $660,582.11 was obtained by the Vigil Defendants through the sale of the Dorado Reef property.

under which the Vigils granted the Bank security and mortgages on real property owned by the Vigils;

    c.    SECURITY AGREEMENT, (a copy of which is attached hereto as Exhibit "L-3"), in which the Vigils as the Grantors, represented and warranted that they are the sole owners of each item of the Collateral upon which they granted a Lien under the terms of the Security Agreement and that they had good and marketable title thereto free and clean of any and all Liens other than those in favor of the Bank (*See* Exhibit L-3, ¶ 5(a)) and

    d.    MORTGAGE NOTE PLEDGE AND SECURITY AGREEMENT, a copy of which is attached hereto as Exhibit "L-4."

    60.    In should be emphasized that none of the Notes and/or Agreements described in paragraph No. 56 reference any assumption of liability by either FVP or Santolaya.

    61.    Furthermore, the Vigils entered into these Notes and/or Agreements with the Bank approximately two months after Judgment was entered against them in the I&P suit.

    62.    Approximately six days before the Vigils entered into these Notes and/or Agreements, the Bank issued a report dated September 23, 2009, titled "CLASSIFIED LOANS ACTION PLAN & STATUS REPORT." A copy of said report is attached hereto as Exhibit "M."

    63.    On the first page of this report is a table titled "Classification History/Classifiable Events/Problem Descriptions." *See* Exhibit M, pg. 1.

    64.    The fourth entry on this table is dated "3-31-09" and states, in relevant part, "The client is no longer owner of Santolaya, Inc. **since he sold his participation to his son and no evidence was found in credit file.**" *See* Exhibit M, pg. 1. (Emphasis Added).

65.     According to the Payment List, however, from November of 2009 through June of 2011 Santolaya issued payments on behalf of the Vigils to the Bank in the total amount of Forty Thousand Six Hundred Four Dollars and Forty-Four Cents ($40,604.44).  *See* USF&G 000023 to 000033 attached to Exhibit K).

66.     Accordingly, even if one assumed that FVF did owe Santolaya approximately $880,000.00 in or about December of 2006, the Payment List fails to offer any explanation as to why Santolaya would issued approximately $660,000.00 to the benefit of the  Vigils **after** the date of transfer.  (Emphasis Added.)

67.     According to FVF's Form 499R-2/W-2PR for 2007 and 2008, the total amount of wages received from Santolaya during this two year time period was $12,600.00.  Copies of said Forms are attached hereto as Exhibit "N."

68.     The overwhelming majority of transactions contained with the Payment List where in the "Source Name" is one or both of the Vigil Defendants contains the following description under the "Memo" column:

### Cta. Personal

69.     The ninth page of the Payment List contains approximately twenty-five (25) such entries for the period of January 26, 2007 to April 3, 2007.  *See* USFG 000009 attached to Exhibit K.

70.     Indeed, among the items which Santolaya has paid on behalf of the Vigils are:

•Car repairs, See USFG 000018 attached to Exhibit K;

•Legal Fees, See USFG 000022 and USFG 000023 attached to Exhibit K;

•Homeowner Association Fees, See USFG 000027 attached to Exhibit K;

12

•Phone Bills, See USFG 000010, USFG 000012, USFG 000030 attached to Exhibit K;

•Credit Card Accounts, See USFG 000011 attached to Exhibit K;

•Clothes and personal goods, See USFG 000014 and 000016 referencing $700.00 paid to

"Macy's" in 2008 attached to Exhibit K and

•Internet, cell phone and cable television service, See USFG 000013 to USFG 000018,

USFG 000023 to USFG 000030, USFG 000032, USFG 000033 and USFG 000035

attached to Exhibit K.

71.     On December 20, 2011, USF&G issued a Subpoena To Testify At A Deposition

In a Civil Action to "Fernando Vigil-Piovanetti, President of Santolaya, Inc."  A copy of said

subpoena is attached hereto as Exhibit "O."

72.     USF&G effectuated service of the Subpoena directed to FVP by delivering a

copy of the same to the address designated for process upon the corporation and by giving a copy

of the same to Santaloya's Secretary, Lillian Cintrón.  A copy of the Proof of Service associated

with the Subpoena directed to Mr. Vigil-Piovanetti is attached hereto as Exhibit "P."

73.     FVP thereafter retained counsel, Eric A. Tulla, Esquire, for purposes of

defending himself and Santolaya in the District Court Action.  Despite effectuating service of the

aforementioned Subpoena on December 22, 2011, FVP refused to appear for deposition in the

Santolaya Suit.

74.     FVP contested the service of said Subpoena under *Fed.R.Civ.P. 45(b)(1)* arguing

that Ms. Cintrón could not accept service on behalf of Santolaya despite her being designated as

a corporate officer in Santolaya's Annual Report filed with the Department of State on June 14,

2011.  *See* Exhibit "Q" attached hereto.

75.     FVF, CP and Ms. Cintrón all appeared for depositions in the Santolaya Suit in January of 2012.

76.     None of these individuals, however, would disclose FVP's address or location.

77.     In fact, the most extensive information regarding FVP's whereabouts was when his mother testified that she believed he was staying in or near Orlando, Florida.  reater Orlando area.

78.     On January 30, 2012, USF&G filed a Motion to Compel FVP's deposition in the District Court Action.

79.     On February 1, 2012, Judge Fuste issued an Order granting USF&G's Motion to Compel FVP's deposition "as requested, under penalty of contempt for failure to comply." (Santolaya Suit, Docket No. 33).

80.     Two days later, FVP filed a Motion for Reconsideration of the District Court's Order of February 1, 2012.[7]

81.     In light of the same, USF&G took additional measures to locate where FVP was staying in the Orlando area was able to personally serve FVP with another Subpoena in Florida on February 8, 2012.  A copy of the Proof of Service associated with this Florida Subpoena is attached hereto as Exhibit "R."

82.     On February 9, 2012, the District Court issued an Order denying FVP's Motion for Reconsideration and commanded FVP to appear for deposition in the Santolaya Suit.

83.     On February 22, 2012, FVP appeared for deposition in this matter pursuant to the

---

[7]  At that time, the discovery end date in the District Court Action was February 15, 2012.  Accordingly, there was a strong belief that FVP was attempting to avoid appearing for deposition in the hope that the discovery deadline would pass.

Court Order.  A copy of his deposition transcript is attached hereto as Exhibit "S."

84.     During FVP's deposition, he produced a copy of Santolaya Stock Certificate No. 05.  Unlike the one previously produced by FVF in November of 2011, this copy was signed by both FVF and FVP.

85.     FVP testified that he resided at 10777 Garden Lily Drive, Apt. 27B, Orlando, Florida 32832.  *See* Exhibit S, pg. 18, ln. 1-12.

86.     FVP further stated that he typically would travel to Puerto Rico one week per month and that he would stay at his parents' home when he was in Puerto Rico.  *See* Exhibit S, pg. 26, ln. 6-8.

87.     According to FVP, his father had purchased a parcel of land, consisting of approximately 22,000 square meters located on State Road, No. 1, Kilometer 39.  *See* Exhibit S, pg. 49, ln. 1-22.

88.     FVP also stated that this parcel of land was developed into a commercial shopping center by Santolaya but that he personally didn't pay any money toward the purchase price of any of the land.  *See* Exhibit S, pg. 56, ln. 6-15.

89.      FVP further testified that he did not recall whether, at any point while he was in his twenties, he had accumulated money that allowed him to purchase any of the properties that consist of the parcels of land developed by Santolaya.  *See* Exhibit S, pg. 63, ln. 16-20.

90.     Despite the same, FVP contended that (i) he was the president of Santolaya, (ii) he was the owner fo the corporation and (iii) he is in charge of everything that's done there.  *See* Exhibit S, pg. 71, ln. 4-20.

91.     When asked about the circumstances under which he acquired all of the

15

outstanding shares of Santolaya from his father in December of 2006, FVP noted that a "verbal transaction" took place between himself and FVF and that there was no writing memorializing the details of this transaction.  *See* Exhibit S, pg. 110, ln. 18-25.

92.    FVP also stated that, in December of 2006, FVF paid "a little bit mover a million dollars" to him but that there was no written agreement memorializing the consideration exchanged between himself and his father other than Stock Certificate No. 5.  *See* Exhibit S, pg. 119, ln. 10-24.

93.    Of great significance to this instant Motion is the fact that FVP testified that he had no recollection of ever being asked to execute a personal guaranty of any debt or loan made to Santolaya since the corporation was formed.  *See* Exhibit S, pg. 144, ln. 22-25, pg. 145, ln. 1-25.

94.    When presented with the Payment List, identified as Exhibit I to this Motion, FVP testified that his father had taken "excessive amounts of money out of the corporation" which then led to FVF transferring all of his ownership in Santolaya to FVP in December of 2006.  *See* Exhibit S, pg. 174, ln. 14-25.

95.    FVP was then asked whether, after the transfer of ownership in December of 2006, whether FVF stopped taking money out of Santolaya to which he replied:

> After - - the information you have from Lillian has the directions to pay Fernando's - - my father's things okay?  We pay certain things from the office, okay?  Everything is accounted, everything is written down, the money that Santolaya pays my father for his services, okay?  And from that money that is given to him, all of that money eventually gets accounted and he will have to pay it back to the corporation.

> *See* Exhibit S, pg. 175, ln. 1-10.

96.    FVP further admitted that he was unaware of how much money FVF had

16

received from Santolaya since December of 2006 to which he stated "not exactly." *See* Exhibit
S, pg. 175, ln. 16-18.

97.    FVP then noted that:

> All- - the money that Santolaya is paying my father, it's an investment.  I
> know that my father is going to pay me back that money, the corporation.

> *See* Exhibit S, pg. 176, ln. 2-4.

98.    FVP further testified that FVF is permitted to access Santolaya funds for his
personal use.  *See* Exhibit S, pg. 180, ln. 2-18.

99.    The pattern of transactions between the Vigils and Santolaya as depicted in the
Payment List are, at best, confusing and lacking of any suggestion that they are grounded in
sound business reasons.

100.    Moreover, the absence of any sound business rationale associated with these
transactions suggests that the Vigils used Santolaya as a repository for their assets in an attempt
to protect the same from claims of their creditors.

101.    As the District Court of Puerto Rico held in *Federal Deposit Insurance Corp. v.
Martinez Almodovar*, 671 F.Supp. 851 (D.P.R. 1987), (hereinafter "*Martinez Almodovar*"), a
corporation's existence will be disregarded when the corporation is merely an agent or alter ego
of the individual or "generally when required in the instance of justice."  *Id. at* 877 *citing Matter
of Bowen Transports, Inc.*, 551 F.2d 171, 179 (7th Cir.1977).

102.    In *Town of Brookline v. Gorsuch*, 667 F.2d 215 (1st Cir.1981), the First Circuit
Court of Appeals succinctly stated the circumstances under which a court should disregard a
corporate existence as a fictitious entity and held:

**the general rule adopted in the federal cases is that a corporate entity may be**

17

**disregarded in the interests of public convenience, fairness and equity.**

*Id. at* 221, *quoting, Capital Telephone Co. v. F.C.C.*, 498 F.2d 734 (D.C.Cir.1974). (Emphasis Added).

103.     In *Ramírez v. United States*, 514 F.Supp. 759 (D.P.R.1981), a case presenting this issue, the District Court noted:

> [a]s a general rule it may be stated that a corporation will be looked upon as a legal entity until reason to the contrary appears, but when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud or defend crime the law will regard the corporation as an association of persons.

*Id. at* 763-64.

104.     As the United States Supreme Court has noted the test to be applied when looking to disregard the corporate veil is  "is one of honesty and justice..." *N.L.R.B. v. Deena Artware, Inc.*, 361 U.S. 398, 80 S.Ct. 441, 4 L.Ed.2d 400 (1960).

105.     Among the circumstances to be considered as guidelines in reaching a determination on this issue are (i) the extent to which the financial affairs and accounts of a corporation and those who control it are confused to the prejudice of creditors, (ii) the undue diversion of funds to individual use, (iii) the evasion of contracts or statutes and (iv) the abuse of control.

*Ramírez, supra at* 764.

106.     Indeed, as the District Court has previously noted, 'the corporate veil may also be pierced 'in reverse', that is, to impose liability on the corporation for the obligations of its shareholders." *Martinez Almodovar*, *supra at* 877 (*citing  Hudson v. Wylie*, 242 F.2d 435, 441-442 (9th Cir.1957)).

107.     In articulating the "the two modalities of piercing the corporate veil" the

District Court  stated:

> it is undisputed that the alter ego doctrine is equitable. And despite defendants' protestations to the contrary, the doctrine may be used both in its classic sense, to pierce the corporate veil to impress the debts of a corporation upon an individual, or in a "reverse" sense, to disregard the corporate form to reach the assets of a corporation for the debts of an individual.

*Id. citing In Towers v. Titus*, 5 B.R. 786 (N.D.Cal.1979)

108.     As previously noted, there is a glaring lack of documentation to suggest that

FVP and/or Santolya assumed the Vigils' liability for the estimated $880,000.00 which FVF

allegedly owed to the company in December of 2006.

109.     Moreover, the Vigils' issuance of approximately $540,000.00 of their personal

income obtained from the sale of the Dorado Reef property to Santolaya's contractors and

suppliers was made approximately five years after the I&P suit had commenced and less than one

year after Chief Magistrate Judge Justo Arenas issued a twenty-six (26) page "Report and

Recommendation" in the I&P suit which concluded be noting "there being no controversy as to

any material facts and USF&G's being entitled to judgment as a matter of law, its motion for

partial summary judgment against I&P should be GRANTED." (I&P Suit, Docket No. 182, pg.

25).

110.     The conclusion that the transfer of the proceeds of the sale of the Dorado Reef

property to Santolaya suppliers and that the transfer of the Vigils' interests in Santolaya

approximately seven months later were made in fraud of creditors is not based only on the

inadequacy of the consideration received.

111.     Rather, much like the transactions addressed in *Martinez Almodovar*, *supra*, the

circumstances of the transfers in this instant matter "point to a pattern designed to hinder, defraud and delay" the Vigils' creditors. *Id.* at 879.

112.    Indeed, approximately five years after the purported transfer of interest to FVP, Santolya continued to regularly issue payments to and on behalf of the Vigils.

113.    Moreover, Santolya has provided the Vigils with motor vehicles, cell phones, internet access, cable television and other financing for over seven years.

114.    In *Martinez Almodovar*, this Court noted that:

The trier of the fact exercising judgment free of the legal presumptions should weigh the most obvious signs of fraud, such as the haste with which the alienation is effected, the insolvency of the debtor, **the relations of family, intimacy or confidence with the acquirer, the state of the business affairs of the transferor and judicial claims pending against him.**

*Id. at* 879.  *See also*, *De Jesús v. Carrero*, 112 D.P.R. 631, 636-37 (1982). (Emphasis Added).

115.    Indeed, in *Martinez Almodovar*, the District Court held that the corporate entities were deemed the acquirers of the subject conveyances and that these entities "must be charged with the knowledge" of the individuals "who as directors and officers of the corporation appear as authorizing the various transactions." *Id. at* 880.

116.    Similar to this approach in *Martinez Almodovar*, USF&G submits Santolaya must be charged with the knowledge of FVF and FVP, who as its officers, authorized the subject transfers.

117.    Indeed, as was the case with the corporate defendants in *Martinez Almodovar*, USF&G contends that Santolaya is liable for the damages caused by the transactions in fraud of creditors.

118.    Furthermore, the *Martinez Almodovar* Court held that the defendants' daughter and son-in-law were liable to the plaintiff as they either (i) actively participated in the fraudulent transactions to the family's corporation or (ii) as officers of the corporation at least knowingly acquiesced to the transactions.

119.    The *Martinez Almodovar* Court held that:

The right of the United States to recover pecuniary loss resulting from fraudulent acts was recognized in this circuit many years ago. *Pooler v. United States*, 127 F. 519 (1st Cir.1904). That right existed at common law and was not created by statute. *Id. at* 520.

*Martinez Almodovar supra at* 882.

120.    At the very least, FVP, in his capacity as President of Santolaya, knowingly acquiesced to those transfers which Plaintiff contends are fraudulent and which have damaged the Plaintiff.

121.    Indeed, FVP, like the corporate officers in *Martinez Almodovar,* is liable to USF&G for the damages resulting from the aforementioned fraudulent transfers.

122.    On February 15, 2012, USF&G filed a Motion for Leave to Amend its Complaint with the District Court and add FVP and Santolaya as Defendants in that action. (Santolaya Suit, Docket No. 51).[8]

123.    On March 6, 2012, Judge Fuste entered an Order granting USF&G's Motion for Leave to file an Amended Complaint specifically noting that:

We grant the motion because we can sense the possibility of fraud against future creditors in the development of this case...

(Santolaya Suit, Docket No. 55).

---

[8] Indeed, it should be noted that the Motion to Amend the Complaint and Add FVP and Santolaya to the District Court action was filed before FVP finally made himself available for deposition.

124.     On March 6, 2012, USF&G filed its Amended Complaint with the District

Court adding both FVP and Santolaya as Defendants in that action.  (Santolaya Suit, Docket No.

52).

125.     USF&G's Amended Complaint consisted of the following Counts as to the

Vigil Defendants:

> •Count I-Fraudulent Transfers v. FVF and CP
> •Count II-Fraudulent Transfers v. FVP and Santolaya
> •Count III-Fraudulent Transfers of Unknown Assets v. All Defendants and
> •Count IV-Transactions in Fraud of Creditors v. Santolaya

> A copy of USF&G's Amended Complaint without exhibits is attached hereto as

Exhibit "T."[9]

126.     On March 13, 2012, USF&G filed a Motion to Effectuate Service of the

Amended Complaint upon FVP and Santolaya through issuance of the same upon their counsel.

(Santolaya Suit, Docket No. 65).

127.     On March 16, 2012, Judge Fuste entered an Order granting USF&G's Motion

and noted that:

> We advise all concerned that cat-and-mouse games do not work in our court.
> We will take severe sanctions, including default, against anyone who
> obstructs the orderly disposition of this matter. Civility and accommodation
> should be the rule; defending on the merits should be the standard. Playing hiding
> games will not work.

> (Santolaya Suit, Docket No. 66).

128.     On May 2, 2012, Judge Fuste issued an Order which stated, in relevant part,

that "discovery is deemed completed. The term to file dispositive motions has expired."

---

[9]  USF&G's Amended Complaint attaches 155 pages of Exhibits which USF&G is certainly willing to
make available to this Court should it wish to review the same.

(Santolaya Suit, Docket No. 79).

129.      On June 12, 2012, the District Court issued an Order which stated:

> Proposed Pretrial Order due by 8/20/2012. Pretrial Conference set for
> 8/21/2012 01:30 PM in Courtroom 7 before Judge Jose A Fuste. Jury
> Trial set for 8/27/2012 09:30 AM in Courtroom 7 before Judge Jose A Fuste.

(Santolaya Suit, Docket No. 90).

130.      On August 21, 2012, the Pretrial Conference took place before Judge Fuste.

The trial date was reset to October 9, 2012 due to FVF having to undergo a procedure on August

24, 2012.  (Santolaya Suit, Docket No. 106).

131.      During the Pretrial Conference, Counsel for FVP and Santolaya informed the

Court of their intention to call an expert at the time of trial.  The Court responded by noting that

no experts would be allowed at this stage.  (Santolaya Suit, Docket No. 106).[10]

132.      Indeed, FVP and Santolaya failed to submit Initial Disclosures as required by

*Fed.R.Civ.P. 26(a)(1)(A)* from the time that USF&G's Amended Complaint was filed in February

of 2012.

133.      Despite the same, FVP and Santolaya attempted to include approximately 950

pages of documents, which had never previously been produced, as part of their proposed

exhibits for trial.

134.      Judge Fuste held at the Pretrial Conference that these proposed exhibits would

only be admissible for the limited purpose of rebutting any claim by USF&G that Santolaya did

not have any supporting records related to payments made by or on behalf of FVF.  (Santolaya

---

[10]   Indeed, USF&G objected to FVP and Santolaya's attempt to designate an expert in mid-August of 2012
as the same failed to comply with the requirements of *Fed.R.Civ.P. 26(a)(2)*, and the District Court's Orders of
August 11, 2011 and June 12, 2012.

Suit, Docket No. 106).

135.    Accordingly, the Vigil Defendants were fully aware that their proposed expert witness would not be permitted to testify at and that the overwhelming majority of documents they were seeking to introduce as exhibits would be prohibited at trial.

136.    At approximately 7:30 p.m. on Thursday, October 4, 2012, FVF issued an e-mail to USF&G's Corporate Representative, Timothy J. Snyder[11], in which he wrote:

> **Dear Mr. Snyder:**
>
> **The contents of this letter have the purpose of informing you that there is a last chance to stop our litigation and save substantial amounts of costs during the coming months and even years.**
>
> **I have not consulted our attorneys, but I know they will accept any final agreement that we could reach.**
>
> **Next Monday is a holiday in Puerto Rico and we shall be meeting on Tuesday on Federal Court or maybe not, if we go to the other court sometime tomorrow.**
>
> **We are in a position to wire to one of your bank accounts the Sum of $65,000.00 by tomorrow at 5:00 p.m., in order to settle this litigation.**
>
> **Our behavior on previous occasions has not responded to our intentions but strictly to the unexpected closing of doors for commitments that have been made previously to us.**
>
> **Sincerely, we believe in finishing this money spending situation.  You have the last word.**
>
> **Sincerely,**
>
> **Fernando Vigil Fernández**

A copy of said e-mail is attached hereto as Exhibit "U."

---

[11]  It appears that FVF obtained Mr. Snyder's e-mail address during mediation sessions in the Santolaya Suit held in September of 2012.

137.    On the morning of Friday, October 5, 2012, USF&G's Corporate

Representative issued a response to FVF's e-mail indicating that the sum referenced in said

e-mail would have to increase significantly in order for there to be a resolution of the Santolaya

Suit.

138.    Facing the stark reality that trial was going to commence in the District Court

one business day later, the Vigil Defendants elected to file this instant petition on behalf of

Santolaya under the provisions of Chapter 11 of the Bankruptcy Code on the afternoon of Friday,

October 5, 2012.  (Docket No. 1).

## PROCEDURAL HISTORY IN THIS INSTANT MATTER

139.    USF&G received confirmation that Santolaya filed its Petition with this Court

when its Counsel electronically filed a notice with the District Court at 4:15 PM AST on October

5, 2012.  A copy of said Notice is attached hereto as Exhibit "V."

140.    On October 26, 2012, Debtor filed an Amended Summary of Schedules

(Docket Nos. 20 and 21), USF&G was listed as a Creditor under Amended Schedule F and the

address listed on the document read:

> UNITED STATES FIDELITY & GUARANTY COMPANY US.
> Paul T. DeVlieger, Esquire
> 1518 Walnut Street, 16th Floor
> Philadelphia, PA 19102

*See* Docket No. 20, pg. 7 and Docket No. 21, pg. 18.

141.    Since the filing of Debtor's Petition, however, the undersigned has not received

any documents from Debtor's Counsel despite the undersigned being listed on the Certificate of

Service accompanying the submissions made on behalf of the Debtor.  (*See e.g.* Docket No. 41,

pg. 6).

142.     Respectfully, Debtor's Counsel's failure to actually serve the undersigned is particularly noteworthy as Debtor has stated that:

> the immediate reason that triggered the filing of this petition was the aftermath of a lawsuit; Civil Case No. 11-1210 (JAF) filed by United States Fidelity and Guaranty Company against debtor's principal father, a former stockholder of the corporation.

> *See* Docket No. 41, ¶ 16.

143.     To be clear, the lawsuit referenced in the above paragraph was against FVF, CP, FVP and Santolaya.

144.     Indeed, the suggestion that the "aftermath" of the lawsuit triggered the filing of Santolaya's petition ignores the fact that the petition was filed one (1) business day before trial was set to begin before Judge Fuste in the District Court.

145.     Furthermore, USF&G filed a claim in the amount of $552,491.20 with this Court on or about February 6, 2013.  *See* Proof of Claim No. 8.[12]

146.     USF&G has had to monitor this action through PACER and has had to review this Court's Docket electronically in order to ascertain any information regarding the same.

147.     It is respectfully submitted that Debtor's Counsel's failure to actually serve the undersigned with any documentation in this matter is illustrative of the existence of bad faith as defined by *11 U.S.C. § 1112(b)*, ("Section 1112(b)"), upon which dismissal is warranted.

---

[12]   As a claimant whose proof of claim is based on a final court judgment, USF&G enjoys standing as a "creditor" who is entitled to request dismissal of this Chapter 11 case.  *See In re Abijoe Realty Corp.*, 943 F.2d 121 (1st Cir. 1991).

### DEBTOR'S BANKRUPTCY FILING WAS MADE IN BAD FAITH
### AND SHOULD BE DISMISSED

148.     Section 1112(b)(1) states, in relevant part, that:

> on request of a party in interest, and after notice and a hearing, the court
> shall convert a case under this chapter to a case under chapter 7 or ***dismiss
> a case under this chapter***, whichever is in the best interests of creditors and
> the estate, ***for cause*** ...

> *Id.*

149.     Section 1112(b) does not explicitly require that cases be filed in "good faith,"
but several Circuit Courts have recognized that a bad faith filing can be cause for dismissal. *See
In re Kerr*, 908 F.2d 400, 404 (8th Cir.1990) (affirming dismissal of petition on grounds that
violation of court orders, self-dealing, and evasive conduct indicated bad faith and "improper
motive" in debtor's Chapter 11 filing). Other circuits have similarly held that the Code contains
an implicit good faith requirement. *See In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d
Cir.1999); *In re Trident Assocs. Ltd. Partnership*, 52 F.3d 127, 130–31 (6th Cir.1995); *In re
Marsch*, 36 F.3d 825, 828 (9th Cir.1994); *Carolin Corp. v. Miller*, 886 F.2d 693, 700 (4th
Cir.1989); *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir.1988); *In re Little Creek
Devel. Co.*, 779 F.2d 1068, 1071–72 (5th Cir.1986).

150.     While Section 1112(b) permits dismissal of a reorganization "for cause", this
term is not defined in the statute so to afford flexibility to bankruptcy courts. *See In re New
Rochelle Tele. Corp.*, 397 B.R. 633 (Bankr.E.D.N.Y.2008).

151.     A bankruptcy court has discretion to determine what additional circumstances,
not enumerated in the statute, may constitute cause. *See In re Clear Blue Water, LLC*, 476 B.R.
60, 66 (Bankr.E.D.N.Y.2012).

27

152.     The United States Supreme Court appropriately summarized a bankruptcy

court's responsibility to enforce a standard of good faith when it stated:

> A court of equity may in its discretion in the exercise of the jurisdiction
> committed to it grant or deny relief upon performance of a condition which
> will safeguard the public interest... These principles are a part of the control
> which the court has over the whole process of formulation and approval of plans
> of composition or reorganization...

> *See Am. United Mut. Life Ins. Co. v. City of Avon Park*, 311 U.S. 138, 145, 61

S.Ct. 157, 161–62, 85 L.Ed. 91 (1940).

153.     This standard of good faith "protects the jurisdictional integrity of the

bankruptcy courts by rendering their powerful equitable weapons (i.e., avoidance of liens,

discharge of debts, marshaling and turnover of assets) available only to those debtors and

creditors with 'clean hands.' " *See In re Little Creek Dev. Co., supra at* 1072.

154.     As a general rule, "the facts surrounding good faith will be determined by

circumstantial evidence. It is unlikely that a debtor will ever acknowledge its own bad faith;

therefore, one will reach conclusions about the party's intent from the totality of the

circumstances surrounding the filing of the case."  *See In re Marsch*, 36 F.3d 825, 828 (9th

Cir.1994) ("The existence of good faith depends on an amalgam of factors and not upon a

specific fact.")

155.     The First Circuit has determined that, "in all events, good faith is a concept not

a construct. Importantly, it is a concept that derives from equity. This matters because equitable

concepts are particularly insusceptible to per se rules." *See In re Puffer*, 674 F.3d 78, 82 (1st. Cir.

2012).

156.     The premise of the good faith standard is that bankruptcy relief should

28

generally be limited only to the "honest but unfortunate debtor." *See Brown v. Felsen*, 442 U.S.

127, 128, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979) (*quoting Local Loan Co. v. Hunt*, 292 U.S. 234,

244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)).

157.　　　Indeed, "congress has never intended that bankruptcy be a refuge for the

irresponsible, unscrupulous or cunning individual." *See In re Rognstad*, 121 B.R. 45, 50

(Bankr.D.Haw.1990); *See also In re Johnson*, 708 F.2d 865, 868 (2d Cir.1983) (" 'Good Faith'

while not defined by statute or legislative history, ... certainly does, however, require 'honesty of

intention' ...").

158.　　　USF&G respectfully submits that there is sufficient evidence before this Court

to determine that Santolaya was not an "honest but unfortunate debtor", but rather, was a debtor

whose principals/officers engaged in fraudulent conduct.

159.　　　Indeed, a review of the "Payment List" produced by FVF in the Santolaya Suit

reveals a pattern of regular, continuous and systematic payments being issued on behalf of the

Vigils by Santolaya.

160.　　　Among the items which Santolaya paid for on behalf of the Vigils are:

•Car repairs, Legal Fees, Homeowner Association Fees, Phone Bills, Credit Card

Accounts, Clothes, Internet Service, Cell Phones and Cable Television Service.

*See* Exhibit K attached hereto.

161.　　　Moreover, from January 27, 2005 through November 9, 2011, Santolaya issued

in excess of **$1,599,000.00** either directly to or on behalf of the Vigil Defendants. *See* Exhibit K

attached hereto.  (Emphasis Added).

162.　　　One need to look no further than to the sworn testimony of Santolaya's

President, FVP, to discern that these payments issued over a nearly six year period were not based upon any legitimate basis but were used as a means to maintain the Vigils' lifestyle without exposing their assets to their creditors.

163.     Indeed, as recently as February of 2012, FVP only could offer the following explanation with respect to the payments that Santolaya was making on his parents' behalf:

> All- - the money that Santolaya is paying my father, it's an investment. ***I know that my father is going to pay me back that money***, the corporation.

> *See* Exhibit S, pg. 176, ln. 2-4.  (Emphasis Added).

164.     Attached as Exhibit B to Santolaya's "Statement of Financial Affairs" filed with this Court on October 26, 2012, was a document titled "Payments to Insiders" for the period from January 1, 2012 to September 30, 2012, ("2012 Insider Payment List").  (Docket No. 19, pg. 30).

165.     According to the 2012 Insider Payment List, Santolaya extended $59,483.00 to FVF during the first nine (9) months of that year despite the fact that the Vigil Defendants were fully aware that USF&G had instituted the Fraudulent Transfer Action against them in February of 2011.  *See* Docket No. 19, pgs. 30-33.[13]

166.     Indeed, in Santolaya's "Summary of Schedules" filed with this Court on October 26, 2012, notes that it "advanced" $1,000,979.00 to a "former stockholder."  *See* Docket No. 19, pg. 5.

167.     As FVP and FVF are the only two individuals ever to be issued Santolaya

---

[13]  In fact, Santolaya's Summary of Schedules reveal that from October 3, 2011 to December 23, 2011, it issued $13,500.00 in payments to the law firm of Garcia & Fernandez which was representing the Vigils in the Santolaya Suit.  See Docket No. 19, pg. 36.

stock, it is not difficult to discern that the "former stockholder" referenced above is, in fact, FVF.

168.    This instant matter is analogous to cases where courts have found the standard of good faith to be lacking when bankruptcy was used as a vehicle to defraud others. *See, e.g., In re Coastal Cable T.V., Inc.*, 709 F.2d 762, 764, 765 (1st Cir.1983) ( "Another such principle prohibits the use of the bankruptcy court, a court of equity, to further a fraudulent purpose...We fear that one or more of these basic principles may have been violated for the following reasons:... there are sufficient allegations of fraud in this case, and they are closely enough related to the relevant debt and in this instance to the court's jurisdiction, to warrant determining the underlying facts and their relation to the question.").

**WHEREFORE**, United States Fidelity & Guaranty Company, respectfully requests that the Court (1) grant this motion, (2) dismiss this Chapter 11 case immediately, with a bar to refiling, and (3) grant such other relief as is just and proper under the circumstances of this case.

## DEBTOR'S CONDUCT CONSTITUTES AN ABUSE OF THE BANKRUPTCY PROCESS

169.    It bears noting that, when granting USF&G's Motion to Amend its Complaint against the Vigil Defendants, the District Court expressly held that:

> We grant the motion because we can sense the possibility of fraud against future creditors in the development of this case...

(Santolaya Suit, Docket No. 55).

170.    The "determination of whether the movant has established prima facie that there is a lack of good faith (or bad faith) in the filing of a bankruptcy petition is a fact intensive inquiry in which the court analyzes the totality of the circumstances." *See In re Costa Bonita Beach Resort, Inc.*, 479 B.R. 14, 40 (Bankr. D.P.R. 2012), ("Costa Bonita"). *See also, Marrama*

31

*v. Citizens Bank of Mass*. (*In re Marrama*), 430 F.3d 474, 482 (1st Cir.2005) *aff'd*, 549 U.S. 365, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007).

171.    The *Costa Bonita* Court noted that "lack of good faith or bad faith is atypical conduct that constitutes an abuse of the bankruptcy process. *In re Costa Bonita, supra at* 40. *See also, Marrama v. Citizens Bank*, 549 U.S. 365, 375 fn. 11, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007); *In re Puffer*, 674 F.3d 78, 82 (1st Cir.2012).

172.    The good faith requirement "is designed to prevent abuse of the bankruptcy process, or the rights of others, involving conduct or situations only peripherally related to the economic interplay between the debtor and the creditor community." *See In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 379 (8th Cir. 2000), *citing* L. King, 7 *Collier on Bankruptcy*, ¶ 1112.07[1] (2000).

173.    In *In re Cedar Shore*, the Eighth Circuit upheld a determination by the District Court for the District of South Dakota held that a Chapter 11 debtors' petition was filed in bad faith because the primary purpose of the filing was to prevent a state court lawsuit from proceeding against the debtor.

174.    The Eighth Circuit placed special emphasis on the fact that the debtor's officers and directors were named defendants in the state court lawsuit as an indicator that the motivation for filing bankruptcy was not to effectuate a valid reorganization but to prevent the state court action from proceeding.

175.    Indeed, in this instant matter, Santolaya has shown no intention of actually submitting a Plan of Reorganization but has adopted the same "delay" tactic exhibited by the Vigil Defendants in both the I&P Suit and the Santolaya Suit.

32

176.    As of this date, Santolaya has filed two (2) Motions for Extensions to file its Disclosure Statement and Plan of Reorganization (Docket Nos. 51 and 55).

177.    Indeed, Santolaya has been enjoying the privilege of being in bankruptcy for more than one hundred and sixty-two (162) days and still it has failed to comply with one of the most basic duties in filing a Plan of Reorganization and Disclosure Statements.

178.    USF&G cannot help but notice that FVF and CP have failed to file their own Disclosure Statements and Plan of Reorganization while the Trustee assigned to FVP's bankruptcy proceeding did not recommend confirmation of FVP's Second Amended Pre-Confirmation Plan filed with this Court.

179.    Respectfully, there is no indication of the Vigil Defendants seeking bankruptcy protection under Chapter 11 to allow them a "breathing spell" while they attempt to reorganize. *See In re Capitol Foods supra* at 25.

180.    To the contrary, as evidenced in FVF's e-mail of October 4, 2012, the filing was to obtain a tactical litigation advantage over USF&G by establishing that USF&G could either accept an offer which was less eight percent (8%) of the amount the Vigils owed on the Judgment entered in the I&P Suit or continue litigating over the "coming months and even years." *See* Exhibit U.

181.    As previously noted, in *In re Kerr*, *supra at* 404, the Eighth Circuit explained that the a debtor's Chapter 11 petition may be dismissed under Section 1112(b) if the debtor had a "***pattern of concealment, evasion, and direct violations of the Code or court order which clearly establishes an improper motive***." (Emphasis Added).

182.    With regards to the Vigil Defendants, the District Court "totally agreed" with

USF&G's characterization that, prior to the filing of the Santolaya Suit, they exhibited a pattern of non-compliance with both their obligations as set forth in the Federal Rules as well as Orders issued by the District Court attempting to ensure their compliance with the same. (Santolaya Suit, Docket No. 23).

183.    Moreover, USF&G was permitted to add FVP and Santolaya as Defendants in the Santoalaya Suit as the District Court determined that it sensed the "possibility of fraud...in the development of this case..." (Santolaya Suit, Docket No. 55).

184.    Similarly, when Santolaya's attorney refused to accept service of the Amended Complaint despite having entered their appearance with the District Court, Judge Fuste issued an Order which stated:

> We advise all concerned that cat-and-mouse games do not work in our court. We will take severe sanctions, including default, against anyone who obstructs the orderly disposition of this matter. Civility and accommodation should be the rule; ***defending on the merits should be the standard. Playing hiding games will not work.***

(Santolaya Suit, Docket No. 66).  (Emphasis Added).

185.    A review of the dockets from both the I&P Suit and the Santolaya Suit clearly reveals a pattern of concealment, evasion and obstruction by the Vigil Defendants which continues to this day and is illustrated by their decision to filed their Chapter 11 Petitions literally hours before trial was to commence in the District Court this past October.

186.    In *In re 15375 Memorial Corp. v. Bepco, L.P.*, ("Memorial Corp"), 589 F.3d 605 (3d Cir.2009), the Third Circuit focused "on two inquiries that are particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose" and "(2) whether the petition is filed merely to obtain a tactical litigation advantage." *Id. at* 618 citing *In*

*re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119-20 (3d Cir.2004) and *In re SGL Carbon Corp.*, 200 F.3d 154, 159, 165 (3d Cir.1999).

187.    The *Memorial Court* upheld the District Court's dismissal of the debtors' Chapter 11 petitions as not being filed in good faith.  In reaching this determination the Third Circuit noted:

> •The petitions did not serve the valid bankruptcy purposes of preserving a going concern or maximizing the values of the Debtors' estates;
>
> and
>
> •The timing of the filing of the bankruptcy petitions showed that the Debtors were not seeking Chapter 11 protection for a valid bankruptcy purpose, but instead were using the filings as a litigation tactic to avoid liability in a state court action and to protect the corporate entities in control of the actual assets.
>
> *Id. at* 619.

188.    Santolaya's action in filing for bankruptcy in this instant matter also are consistent with tactical behavior repeatedly demonstrated by the Vigil Defendants which is predicated upon extending the length of the litigation.

189.    Respectfully, when analyzing the "totality of the circumstances" as part of the determination of whether this petition was filed in bad faith, the facts and events which gave rise to the Fraudulent Transfer Action currently pending against the Vigil Defendants in the District Court simply cannot be ignored.

190.    Indeed, the totality of circumstances in this instant matter includes, but is not limited to:

(i) the circumstances and events which led to USF&G initiating a Third-Party Complaint against the Vigils in October of 2001 in the I&P Suit,

(ii) The District Court's subsequent entery of Judgment in the total amount of $778,191.55 against the Vigils in July of 2009.

(iii) FVF's inaccurate deposition testimony from August of 2010 wherein he claimed to have used in excess of $500,000.00 obtained from the sale of the Dorado Reef property to pay I&P suppliers and subcontractors.

(iv) FVF's continuation of this misrepresentation in his Verified Answer filed in August of 2011 in the Santolaya Suit, (Santolaya Suit, Docket No.19).

(v) FVF's realization that he could no longer maintain this position in November of 2011 when serving Verified Interrogatory Answers and producing documentation which clearly demonstrated that the proceeds of the sale of the Dorado Reef property were used to pay suppliers and contractors of Santolaya.

(vi) FVF's denial of interest and affiliation with Santolaya in August fo 2010.

(vii) FVF's assertion that FVP was the total owner of Santolaya when, in fact, FVP did not have any ownership interest in Santolaya until four years after the corporation was established. *See* Exhibit E.

(viii) FVF's failure to disclose that he possessed 80% of the total shares of Santolaya stock issued from September of 2000 to at least December of 2006.

(ix) That the Vigil Defendants cannot produce any contracts, notes, minutes, agreements or writings which memorialize any transfer of interest in Santolaya to FVP in exchange for FVP assuming $880,000.00 in debt to the corporation in December of 2006.

(x) That, as recently as February of 2012, FVP testified that he had no recollection of ever being asked to execute a personal guaranty of any debt or loan made to Santolaya since the corporation was formed. *See* Exhibit S, pg. 144, ln. 22-25, pg. 145, ln. 1-25.

(xi) That, as recently as February of 2012, FVP testified that he was totally unaware of how much money FVF had received from Santolaya since December of 2006. *See* Exhibit S, pg. 175, ln. 16-18.

(xi) That, as recently as February of 2012, FVP testified that FVF is permitted to access Santolaya funds for his personal use without having to seek permission from the corporation. *See* Exhibit S, pg. 180, ln. 2-18.

(xii) That the parcel of land which was developed into the commercial shopping center by Santolaya was completely purchased by FVF without any monetary contribution from FVP. *See* Exhibit S, pg. 56, ln. 6-15.

36

(xiii) That FVP and Santolaya refused to permit their counsel to accept service of USF&G's Amended Complaint in the Santolaya Suit despite the fact that their counsel had already entered his appearance in that matter.

(xiv) That, from November of 2009 through June of 2011, Santolaya issued payments on behalf of the Vigil Defendants to Oriental Bank in the total amount of Forty Thousand Six Hundred Four Dollars and Forty-Four Cents ($40,604.44).  *See* USF&G 000023 to 000033 attached to Exhibit K) and

(xv) That from January 27, 2005 through November 9, 2011, Santolaya issued in excess

of **$1,599,000.00** either directly to or on behalf of the Vigils.  *See* Exhibit K.

**WHEREFORE**, United States Fidelity & Guaranty Company, respectfully requests that

the Court (1) grant this motion, (2) dismiss this Chapter 11 case immediately, with a bar to

refiling, and (3) grant such other relief as is just and proper under the circumstances of this case.


## CERTIFICATE UNDER THE SERVICE MEMBERS CIVIL RELIEF ACT

To the best of our information and belief Debtor is not currently serving on active duty in

the Armed Forces of the United States (Army, Navy, Air Force, Marine Corps and Coast Guard),

nor in the National Guard or the Air National Guard, nor he is commissioned in the National

oceanic and Atmospheric Administration or in the Public Health Service.

## <u>NOTICE PURSUANT TO LBR 9013-1(h)</u>

Within thirty (30) days after service as evidenced by the certification, and an additional

three (3) days pursuant to Fed. R. Bank P. 9006(f) if you were served by mail, any party against

whom this paper has been served, or any other part to the action who objects to the relief sought

herein, shall serve and file an objection or other appropriate response to this paper with the

Clerk's office of the U.S. Bankruptcy Court for the District of Puerto Rico. If no objection or

other response is filed within the time allowed herein, the paper will be deemed unopposed and

may be granted unless: (i) the requested relief is forbidden by law; (ii) the requested relief is

against public policy; or (iii) in the opinion of the Court, the interest of justice requires otherwise.

**RESPECTFULLY SUBMITTED** in San Juan, Puerto Rico, on March 19, 2013.

**CERTIFICATE OF SERVICE**: I hereby certify that on this same date I electronically filed the

foregoing with the Clerk of this Court using the CM-ECF system which will send notification of

such filing to all CM-ECF participants registered to receive notices in the case at bar, including

Debtor's Counsel of Record, the Appointed Trustee and the U.S. Trustee.

**DEVLIEGER HILSER P.C.**

*/s/ Paul T. DeVlieger*
PAUL T. DEVLIEGER, ESQUIRE (222501)
1518 Walnut Street, 16th Floor
Philadelphia, PA 19102
(215) 735-9181 pdevlieger@dvhlaw.com

Dated: March 19, 2013